Louis N. Wente, appellee, v. Chicago, Burlington &
Quincy Railway Company, appellant.*

Filed May 24, 1907.  No. 14,650.

Carriers: Liability.  When facts are disclosed from which it appears
that an animal has not suffered through the neglect of a carrier
intrusted with its transportation, the rule that proof of the
receipt of animals by a carrier in good order and delivery at
destination in bad order makes a *prima facie* case of liability
against the carrier has no weight as against such facts.

Appeal from the district court for Lancaster county:
Edward P. Holmes, Judge.  *Reversed.*

*J. W. Deweese* and *Frank E. Bishop,* for appellant.

*Halleck F. Rose* and *Wilmer B. Comstock, contra.*

Jackson, C.

The plaintiff had judgment for the value of a stallion,
which it is charged died through the neglect of the de-
fendant in transportation.   The substance of the com-
plaint is that the plaintiff delivered the stallion to the de-
fendant in the city of Lincoln to be transported to Mexico
City, Missouri, on a fast train due to leave Lincoln at 6
o'clock P. M. on December 14, 1904; that by direction of
the defendant the stallion was loaded into the car at 5
o'clock P. M. of that date, but through defendant's neg-
lect the car was not attached to the train leaving Lin-
coln at 6 o'clock P. M., but was detained in the yards
until 10:45 o'clock P. M. of that date, when it was at-
tached to another train, and was delayed in transportation
so that it did not reach Kansas City, Missouri, until about
5 o'clock A. M. of December 16, that the defendant negli-
gently and unlawfully failed and refused to unload the
horse to be rested, fed and cared for during the entire
journey from Lincoln to Kansas City, and kept the horse

* Rehearing allowed.   See opinion, p. 179, *post.*

confined in the car on board the train for 49 hours and 10 minutes; that by reason of this neglect the horse took cold and became sick; that the weather was warm when the horse was loaded at Lincoln, but became cold on the 15th, and along the route to Kansas City continued to grow colder, with cold wind accompanied by rain and snow; that about noon of December 16 the plaintiff, through his employee, notified the defendant at its freight office in Kansas City that the stallion was sick, and requested that the horse be unloaded that it could be given medical attention; that the defendant was advised that the animal was a valuable stallion and was contracting pneumonia, that it needed immediate medical attention which could not be properly given while the animal was detained in the car, but that the defendant negligently and carelessly kept and detained the animal on board the car in its yards in the increasing cold and storm until 7:10 P. M. of the 16th, although frequently requested to place the car so that the animal could be unloaded; that, if the defendant had delivered the car to a platform to permit the horse to be unloaded within a reasonable time after being requested so to do, its life could have been saved by proper medical treatment. The appeal involves the sufficiency of the evidence to sustain the judgment.

J. R. Jones, an employee of the plaintiff, accompanied the animal as a caretaker, and it is disclosed from his testimony that the horse was shipped in a box car suitable for the purpose. He provided bedding, hay and grain for the journey, and personally attended to furnishing the horse with water. There is no dispute that a horse might be confined in a car during a journey of from a week to ten days without danger on account of confinement alone, if otherwise well cared for. There was no request that the horse should be unloaded en route, and no evidence that his condition required it. When facts are disclosed from which it appears than an animal has not suffered through the neglect of a carrier intrusted with its transportation, the rule that such carrier is an insurer of

animals transported over its line, and that proof of the receipt of animals by a carrier in good order and delivery at destination in bad order makes a *prima facie* case of liability against the carrier, has no weight as against such facts. The claim of liability on account of delay in shipment and en route should therefore properly be eliminated from the inquiry.

Several elements enter into the consideration of the charge of delay at Kansas City. The shipping contract was for the transportation of the animal from Lincoln, Nebraska, to Mexico City, Missouri, by way of Kansas City. From the latter point the route was over the Alton. There is little substantial conflict in the evidence as to what occurred in Kansas City, where Jones arrived with the horse at 5 o'clock in the morning of December 16. The train on which the shipment was to be made over the Alton was due to leave at 1 o'clock P. M. It appears to have been incumbent on the defendant to transfer the car from its own yards to those of the Alton. This was done at about 12 o'clock M. In the meantime Jones discovered that the horse was chilled. He called a veterinary surgeon, and it was determined to have the animal unloaded and placed in a veterinary hospital for treatment. He went to the Alton freight office to arrange for that course, and says he was there shortly after 12 M., when the way bill came into that office from the hands of the defendant's agent. After some parley at the Alton office Jones secured a release of the animal from that company, and went from there to the freight office of the defendant, according to his testimony, at 1:20 o'clock P. M., where he paid the freight to Kansas City, and requested that the car be placed so that the animal might be unloaded. The car, however, was not returned by the Alton to the defendant's yards until about 4:30 P. M., and, according to the plaintiff's evidence, was not placed by the defendant so that the animal could be unloaded until 7:10 P. M. The delivery of the animal to the Alton by the defendant was

without notice to the defendant's agent of a desire to unload, or that the horse was not in good condition. The shipping contract relieved the defendant from liability for loss or damage after delivery to the connecting line, so that the question resolves itself into an inquiry of whether the delay in placing the car so that it might be unloaded after its return to the defendant's yards can be said to be the cause of the animal's death, and if so, whether the defendant is liable therefor. In that connection the condition of the horse after arrival at Kansas City seems important. When Jones went to water and feed the horse in the morning he seemed to be chilled. He untied him and led him back and forth in the car, and he coughed some, as Jones says, indicating that he had taken a little cold. He watered and fed him and went to get his own breakfast. When he came back to the car at about 11 o'clock A. M., the horse showed distress and would not eat. At this time he called the veterinary, who testified that the case was not serious, and was one where recovery was usually secured by proper treatment. When the horse was finally taken out of the car, Jones says that he acted fairly well, and did not show anything near the distress that he did later. He was led behind a carriage for a distance of two miles through a severe sleet and snow storm to a veterinary hospital. After being led from six to ten blocks he appeared exhausted, and when he reached the hospital was bleeding at the nostrils, and his condition was practically hopeless. He died the following day. On behalf of the defendant the testimony discloses that when the car was returned from the Alton yards there was a congestion of cars in its own yards, crews were busy making up trains for departure, and that the car was set at the platform for unloading the horse as soon as it could reasonably be done. It is also shown that there were livery stables near at hand where the animal might have been taken, and avoided the necessity of the two mile trip through the storm, resulting in the exposure incident to that trip.

As we view the case, the cause of the death of the ani-

mal is a mere matter of conjecture. From the single fact that an animal is sick no presumption of neglect can arise, any more than such presumption would be justified from a similar condition of a human being. In this case it is pleaded and proven that, if the horse had been subjected to suitable treatment when its sickness was discovered at Kansas City, it would probably have recovered. When it was determined that treatment was necessary, the animal had passed beyond the control of the defendant and was under the control of the Alton, for whose acts the defendant was in no sense responsible. The care and responsibility imposed upon the defendant had terminated by contract of the parties. No request was made of the Alton to place the car where it might be unloaded, and during the four hours or more that the car was in the Alton yards no negligence could be imputed to the defendant, whose responsibility had ceased. It was not bound to receive the animal back from the Alton for the purpose of unloading. Its acts in that respect were a mere gratuity. It was not even a bailee for hire.

We do not think it a reasonable inference from the evidence that the loss of the animal was due to any neglect on the part of the defendant, and recommend that the judgment of the district court be reversed and the cause remanded.

DUFFIE and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause remanded.

REVERSED.

The following opinion on rehearing was filed March 19, 1908. *Former judgment of reversal vacated and judgment of district court affirmed:*

1. **Carriers:** RIGHTS OF CONSIGNOR. The consignor of a horse shipped from one point to another, which will necessitate shipment over two connecting lines of railroad, on the arrival of the horse at

the connecting point of said roads, may, if he so desires, decline to ship farther, and upon payment of the charges of the first carrier demand a redelivery of such horse.

2. ——: DUTIES.  In such case it is the duty of the carrier to redeliver said horse without unreasonable delay.

3. ——: NEGLIGENCE.  Where, in the month of December, a railroad company agrees with an intending shipper of a horse to ship such horse on a particular fast freight train, and the horse is delivered to said company within the time prior to the time of departure of such train designated by the agent of said company, and said company fails to ship such horse on said fast train, but ships it on another and slower train, which does not reach the connecting point of such shipment until about 24 hours later than said horse would have reached such point if shipped on said fast train, and during said last named 24 hours the weather changes and becomes cold and stormy, by reason of which said horse contracts a cold, and after the arrival of such horse at said connecting point the consignor notifies the agent of the carrier at said connecting point that such horse is a valuable horse, that it is sick and in need of immediate medical attention, that he does not intend to ship the horse farther, but wants the car containing the horse switched to some chute or platform so that it can be unloaded for treatment, and pays the carrier's charges for shipment to such point, and the agent of the carrier fails and neglects, for the space of five or six hours thereafter, to place said car in a position where said horse can be unloaded, and about three hours after the payment of the charges and demand for the unloading of the horse a storm of snow and sleet sets in which continues down to and after the time such horse is finally unloaded, which necessitates the unloading of the horse in said storm, and after being unloaded the horse is led through said storm to a veterinary hospital, and as a result of such delay and exposure the illness of the horse is increased to pneumonia, of which it dies; held, sufficient to sustain a finding that such delay on the part of the carrier was negligence which was the proximate cause of the death of said horse.

4. ——: ——: QUESTION FOR JURY.  Where the owner of such horse, after it is unloaded, acting under the supervision of a competent veterinary surgeon whom he has employed, leads said horse, in the storm which has arisen, through the streets of the city for a distance of two miles to the veterinary hospital; held, a question of fact for the jury whether a reasonably prudent man under like circumstances would have so done.

5. Instructions examined, and held to have properly submitted the questions at issue to the jury.

6. **Evidence** examined, and *held* sufficient to sustain the findings of the jury.

FAWCETT, C.

This case is before us on rehearing. Appellee had judgment in the court below for the value of a thorough-bred stallion, which, it is charged, died through the neglect of appellant in transportation. The former opinion, *ante*, p. 175, clearly states the allegations contained in plaintiff's petition. For answer the defendant alleged that the destination of the horse so shipped over its line of railroad was Mexico City, Missouri, on the Chicago & Alton Railroad, with which its line connected at Kansas City, Missouri; denied plaintiff's ownership of the horse, and called for proof thereof; alleged that it was part of the contract of shipment that plaintiff was to furnish a caretaker of said horse, who should go along with the same and look after and care for it and give it proper and necessary care and attention, and that said agent of plaintiff did accompany and give attention concerning the handling and care of said horse; that plaintiff did not deliver the horse to defendant in time to be carried any faster, or to be delivered to the connecting carrier at Kansas City any quicker than the same was carried and delivered; that the shipment was made without any unusual and unnecessary delay, and was promptly delivered on time, in the regular course of business, to the connecting carrier, the Chicago & Alton Railroad at Kansas City, without any fault or negligence on the part of defendant, its agents or servants; that, if said horse in said shipment referred to sustained any injury, such injury was not caused by any fault or negligence on the part of defendant, nor while the horse was in its possession, but, if any injury was sustained by it in any way, the same was the result of the plaintiff's own negligence and that of his agent in charge of said horse, and without fault of the defendant; adding a general denial. The plaintiff's reply was a general denial.

The main questions discussed at the bar are: (1) Was appellant guilty of negligence in failing to ship the horse on a fast train which left Lincoln at 6 o'clock on the evening of shipment, and in shipping it on a later and slower train which did not leave that city until 10:55 on the evening of shipment? (2) Was appellant guilty of negligence, after the arrival of the horse in Kansas City, on the second day after its shipment, in failing to place the car in a position so that the horse could be unloaded, for an unreasonable length of time after it was notified by appellee's agent that the horse was sick and needing attention, and that he had decided not to ship the horse farther, but desired to remove it from the car for treatment? (3) Was appellee guilty of contributory negligence after the horse was unloaded in leading it a distance of two miles through the streets of Kansas City in a storm of snow and sleet to a veterinary hospital?

As to points 1 and 2, the evidence is decidedly conflicting. As to the third point, there is no conflict in the evidence. The caretaker of the horse, who went with it and took care of it on the trip, was one J. R. Jones, who, it appears from the evidence, was an entirely competent person for such a charge. The evidence shows that at the time of the shipment, December 14, 1904, appellant had two freight trains leaving Lincoln for Kansas City; one, No. 120, a fast through freight, which also carried passengers and express, being scheduled to leave Lincoln at 6 P. M., and the other, No. 110, a slower freight, scheduled to leave at 7 P. M. No. 120 left Lincoln that evening on time. No. 110 left 3 hours and 55 minutes late; viz., at 10:55 P. M. Appellee testifies that, when he made arrangements with the agent of appellant for shipping the horse, it was with the understanding and agreement that the horse should go on No. 120. This part of his testimony is corroborated by appellant's employee with whom he had the transaction. Appellee also testifies that he was advised by appellant's employee that if the horse was loaded by 5 o'clock it would be in time for that train. This is

denied by appellant's employee, who says he told appellee
that the horse must be loaded by 4:30 o'clock. Appellee
and his caretaker, Jones, both testified that the horse was
loaded before 5 o'clock. In their testimony on rebuttal
they both placed it as early as 4:30 o'clock, but in their
examination on the case in chief they placed it as being
before 5 o'clock. Appellee, as an explanation of why he
was so sure that it was before 5 o'clock, said that the sun
was still shining when they got the horse loaded. If this
is true, then the horse was loaded before 5 o'clock, as it
is a matter of common knowledge that on that day of the
year the sun sets before that hour. This testimony on
the part of appellee and the witness Jones is contradicted
by two employees of appellant, one of whom says he was
present when the horse was loaded, the other basing his
testimony upon what had been told him.

Train No. 120 left Lincoln that evening on time at 6
P. M., but the car in which the horse had been loaded
was not attached to that train. The car was attached to
train No. 110, which, as before stated, did not leave Lin-
coln until 10:55 P. M. Train No. 120 arrived in Kansas
City early in the forenoon of the next day, December 15,
while train No. 110 did not reach Kansas City until 4:50
o'clock of the second morning after shipment, December
16. Train No. 110 was delayed en route for nearly two
hours at Table Rock, and did not arrive at St. Joseph until
about noon on the 15th. The car was then placed on a
side track, and remained there until a few minutes after
11 o'clock that night—a delay of about 11 hours. It
reached Kansas City, as stated, at 4:50 o'clock the next
morning. On arrival there, Jones, the caretaker, went to
the Alton freight house to ascertain what time they could
get away from there. He was advised by some man there
that he would have to come back after the day man came
on, which would not be very long. He then went back
to the car and fed and watered the horse. He says the car
was then standing between the Burlington and Alton
freight depots. After feeding the horse he went and got

his breakfast. On his return he located the car farther down in the yard—"quite a long way down." He says when he went to water and feed the horse in the morning he noticed that he seemed to be a little chilly, and untied him and led him back and forth, exercising him in the car; that he exercised him quite well in the car; that, after getting his breakfast, he returned to the car about 11 o'clock, when he discovered that the horse was showing a good deal of distress; that he was "taking sick pretty fast"; that he "went straight and called a veterinary"; that before he called the veterinary he went to the Alton freight depot and notified them that the horse was sick, and that he would not ship any farther. The veterinary whom he called was Dr. R. C. Moore, a graduate of the Chicago Veterinary College in 1887, and president of the Kansas City Veterinary College, a man well up in his profession, as appears from the record, and owning a hospital for the treatment of sick horses. Dr. Moore arrived, and went into the car to see the horse about 12 : 30. While Dr. Moore was in the car examining the horse, Jones went to the Burlington office, and told them the horse was sick, and that he wanted to unload him immediately. While he was talking, Dr. Moore came in, and also told the representative of appellant that the horse was sick and should be unloaded at once. Dr. Moore and Jones both testify that the agent promised to have the car set up to a chute or platform immediately, so that the horse could be unloaded, but, before doing so, demanded that the contract be surrendered and the freight to Kansas City paid. Dr. Moore and Jones both testify that Jones paid the freight as demanded at 1 : 20 o'clock. The agent testifies that this was done at 3 : 50 P. M. After this interview Dr. Moore returned home. Jones testifies that between 12 and 1 o'clock there was sent to the agent of the Burlington this message from the agent of the Alton: "I understand this horse is sick and in need of attention. Must therefore refuse shipment." Jones further testifies that during the afternoon he made repeated visits to the agent of appel-

lant and also to the day yardman, urging them to set up the car so that he could unload the horse; that he told the agent that it was a valuable horse and was sick and needed attention; that the car never was moved from the place where he found it on his return to it after breakfast, at 11 o'clock in the forenoon, until they coupled on to it to run it up to the platform for unloading at 7 o'clock that evening. He says that, after the night yardman came on duty at 6:30 that evening, he went to him and told him his troubles; that the night man told him that he would attend to it. He seems to have been expeditious, for at 7:10 P. M. the horse was unloaded. Appellant's agent at Kansas City testifies that, when the car arrived in the morning, it was delivered to the yards of the Chicago & Alton, and was not returned to their yards until 4:15 that afternoon; that during all of that time it was beyond their control. The agent who gave this testimony is so squarely contradicted by Dr. Moore and Mr. Jones as to the time of the payment of the freight that the jury evidently discredited him, and the conviction is forced upon us that, if the message from the agent of the Alton, above recited, was sent to him between 12 and 1 o'clock, he must have been negligent indeed in failing to have that car returned to his custody earlier than 4:15 in the afternoon.

Defendant's witnesses testified that the car was delivered to the Alton at 12:15 and left on the Alton tracks. Jones says it was never moved after 11 A. M. until after the night man came on duty in the evening. Defendant's general yardmaster, who was examined as to the transfer of cars from the Chicago & Alton tracks, testified that such transfers could only be made between the hours of 11 A. M. and 4 P. M. He said: "On account of us having to go through the Union depot, and over the Union depot property, they will not allow us to deliver transfers only during those hours." Yet the chief yard clerk testified that the car was received back from the Alton at 4:15. If they were not allowed to deliver transfers after 4 o'clock, the jury may well have discredited the testimony

that the car was not returned to defendant's yards until
4 : 15, and have accepted the testimony of Jones that the
car was never moved from the place where he found it
after breakfast, about 11 o'clock A. M., until it was
switched up to the platform for unloading in the evening.
Jones unquestionably knew where the car was every hour
of that day.  He was using every effort to have it run up
to some platform so that he could unload.  If his testi-
mony is true, and of that the jury were the judges, the car
was not delivered to the Alton at 12 : 15 and returned by
the Alton at 4 : 15, but, on the contrary, was never actually
out of appellant's yards and control.

The evidence further shows that during the night prior
to the arrival of the horse in Kansas City the weather
changed and began to grow colder.  During the forenoon
some snow fell, but Dr. Moore testifies that the snow had
dried off.  He says: "When I was down at the car, it was
a fairly cold day, a little cloudy.  It had been snowing in
the forenoon and had dried off.  The streets were compara-
tively dried off when I was at the depot, and remained
dry until probably about 4 o'clock in the evening."  Jones
also testifies that the weather was good that day until
about 4 o'clock in the evening.  About 4 o'clock it began
to snow and sleet, and from that time on until after the
arrival of the horse at the hospital the storm seems to have
been more or less continuous.  Jones testified that, when
the horse came off the car, he acted fairly well; did not
show anything near the distress that he did farther on on
the trip.  They led the horse behind a buggy to the hos-
pital, a distance of about two miles, during the storm
above referred to.  When they reached the hospital the
horse was bleeding at the nose, and showing great dis-
tress and exhaustion.  Dr. Moore says that at that time
his case was hopeless.  The next day the horse died.  On
cross-examination Dr. Moore was interrogated by counsel
for appellant as to whether or not there were stables near
the depot to which the horse might have been taken: "Q.
There are good barns?  A.  Fairly good barns; but they are

tie stalls, and not very well protected from breeze, cold air. They are not very good barns for sick horses. Q. I am not asking you that, I simply asked you if the barns were good shelter? A. I suppose, yes; plenty of stables— Q. Well fit for taking care of horses? A. Of well horses; yes, sir. Q. You go there I presume to those barns, some of the places, to treat horses, do you not? A. Yes, sir; and take them from these places to the hospital frequently." It further appears from the evidence that, in taking the horse from the car to the hospital under the circumstances under which he was taken, Jones was acting under the direction of the veterinary. In answer to a question as to whether or not he was present when the horse was unloaded, Dr. Moore said: "I sent my assistant, Dr. Merker; had him come with the horse to the hospital, * * * I had my assistant remain with Mr. Jones until the car was set out to unload him." From this it would appear that Jones was acting under the guidance of the veterinary whom he had employed in the emergency which confronted him.

Appellant insists that the taking of the horse through the streets of Kansas City for a distance of two miles to the hospital in the storm was such negligence as precludes a recovery in this case. Appellee insists that it was not negligence; and, to our minds, this is the really important question in this case. This point, it seems to us, must be determined by the rule of what a reasonably prudent man would have done in Mr. Jones' situation, under the surrounding circumstances and conditions. We think that was a question for the jury. It was for the jury to say whether or not a reasonably prudent man, under those circumstances, would have followed the guidance of the veterinary surgeon, whom he had employed, and have taken the horse to the hospital, as Jones did, or whether a reasonably prudent man, under those circumstances, would have refused to take the horse, and have sought shelter for him in some of the other stables in that neighborhood. On a careful reading of the entire record, and a

careful consideration of all the facts and circumstances disclosed, we think that the questions: (1) Did the appellant agree to ship the horse on train No. 120? (2) Was the appellant guilty of negligence in not doing so, and holding it for shipment on the later and slower train? (3) Was it negligent in delaying the shipment of the horse from Lincoln from the time it was loaded in the afternoon until 10:55 that night? (4) Was it negligent in delaying the shipment of the horse for 11 hours at St. Joseph? (5) Was it negligent in failing to switch the car up to some chute or platform, where the horse could be unloaded, during the entire afternoon of the day the horse arrived in Kansas City, in the face of the repeated requests of Jones that it do so? (6) The question as to whether or not appellee was negligent in permitting the horse to be taken from the car to the hospital during the storm referred to—were all questions of fact for the determination of the jury. We have examined the instructions of the court, and, in our opinion, these questions were all properly submitted. The jury have decided these questions in favor of appellee, and there is ample testimony in the record to sustain their verdict. We do not think the statement by the agent of appellant that the great number of cars in the yards at Kansas City, and the large amount of their business, was such that they could not place the car where it could be unloaded any sooner than was done, is either a sufficient or truthful excuse for their long delay. They were advised, both by Jones and the doctor, that this horse was sick; that he was a valuable horse, and that it was necessary for his treatment that he should be unloaded at once, and yet no steps whatever were taken until the night man came on duty at 6:30 that evening. We regard the conduct of appellant's agents at Kansas City as entirely inexcusable, and think that defendant should be held responsible for their negligence. If the horse had been shipped on train No. 120, it would not only have reached Kansas City, but would have reached its destination at Mexico City, Mis-

souri, long before the storm referred to, and appellee would undoubtedly have suffered no injury. The negligence of appellant in not keeping its agreement with appellee, in delaying the shipment of the horse, and in not promptly furnishing facilities for unloading it, under the circumstances shown, were clearly the proximate cause of the injury; and we cannot say, as a matter of law, that the jury were wrong in finding that the act of appellee in taking the horse from the car to the hospital, under the circumstances under which he was taken, was such action as any reasonably prudent man would have taken under the same circumstances.

We recommend that the former judgment of this court be vacated and set aside, and that the judgment of the district court be affirmed.

CALKINS and ROOT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the former judgment of this court is vacated and set aside, and the judgment of the district court is affirmed.

JUDGMENT ACCORDINGLY.